## Case No. 6,155.

### HART v. SHAW.

#### [1 Cliff. 358.] [1]

Circuit Court, D. Massachusetts. Oct Term, 1859.

CHARTER-PARTY — PERFORMANCE — FREIGHT FOR LOST CARGO—AMBIGUOUS CONTRACT—INTENTION OF PARTIES.

1. In its nature the contract for conveyance of merchandise for a round sum is an entire contract, and unless it be completely performed by the delivery of all the goods at the place of destination, the carrier will in general derive no benefit from the time and labor expended in the partial performance; but if the owner of the cargo is the cause of its not being transported to the port of destination, full freight may be recovered.

2. Whenever the language of a contract is ambiguous, the intention of the parties is the primary rule of construction; and in order to understand the sense in which language was employed, it is necessary to examine attending circumstances, and weigh terms in connection with the subject-matter to which they were applied.
[Cited in Melcher v. Ocean Ins. Co., 59 Me. 220.]

3. In this case, a guaranty of eight feet of water "at the place of loading" was construed to mean eight feet, or at least a sufficient depth to enable the vessel to perform her voyage at the place of loading and thence to the open sea.

[Appeal from the district court of the United States for the district of Massachusetts.] The libellant [Thomas Shaw], master of the schooner B. F. Reeves, chartered her to respondent [George Hart], to bring a quantity of cedar spars from Thoroughfare Island, in North river, N. C., for the round sum of one thousand dollars as freight; the cargo to be delivered by respondent within reach of the vessel's tackles, by whom also eight feet of water at the place of loading was guaranteed. It appeared that the place of loading was somewhat more than one hundred miles from the open sea, and while the water was more than eight feet deep at the place of loading, the vessel in proceeding to the sea would have to pass through Hatteras Inlet, and over a bar at the mouth of the river, on which were only seven feet of water. When two thirds of the cargo was taken on board, at the place of loading, it was found the vessel drew seven feet, and the libellant and the agent of the respondent agreed in the opinion that she could not safely undertake to carry any more through the inlet or over the bar. The remainder of the spars were thereupon formed into a raft, and the libellant gave bills of lading, stating the number of spars under and on deck and in the raft, which was to be towed through Hatteras Inlet and there taken on deck, and undertaking to deliver the whole to respondents, "dangers of the seas excepted." After passing the bar at the mouth of North river, the vessel encountered a sharp chopping sea, and the raft was broken up and lost, with the exception of a

¹ [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

few spars picked up by the crew. The vessel proceeded on her voyage and delivered all the spars taken on board, and the libel was brought to recover the entire sum agreed upon as freight. The decree of the district court was for the whole sum stipulated in the charter. From this decree the respondent appealed.

John C. Dodge, for libellant.

The undertaking of the libellant was necessarily dependent upon the respondent's guaranty. The parties surely did not intend that the vessel should be placed in a hole twenty miles from deep water and loaded there, whence she could never come with her load. Libellant had the right to come home with what spars he could bring, and is entitled to his full charter-money. Clarke v. Crabtree [Case No. 2,847]; Giles v. The Cynthia [Id. 5,424]; Kleine v. Catara [Id. 7,869]. The spars were lost by perils of the sea. Bullard v. Roger Williams Ins. Co. [Id. 2,122].

F. C. Loring, for appellant.

The only stipulation the parties deemed it necessary to make was, that the water was eight feet in depth at the place of loading. The charter-party required that the spars should be brought all the way on board the vessel. The burden of proof is on the libellant to show that the spars were lost by the dangers of the seas. Story, Bailm. § 529; Ang. Carr. § 61. Performance of an entire service was by the terms of the contract a condition precedent to the earning of freight. 3 Kent, Comm. 296; Cook v. Jennings, 7 Term R. 381; Clarke v. Gurnell, 1 Bulst. 167; Barker v. Cheviot, 2 Johns. 352; Scott v. Libby, Id. 336; Penoyer v. Hallett, 15 Johns. 332; Towle v. Kettell, 5 Cush. 18.

CLIFFORD, Circuit Justice. It is not controverted that the libellant, when the vessel reached the island mentioned in the charter-party, gave notice of her arrival to Heman S. Hinds, as therein stipulated to be done, and proceeded to take in the spars furnished by him. He was the correspondent of the charterer, and beyond question was his agent to furnish the spars and deliver them to the master of the vessel. To that extent he is clearly recognized as the agent of the respondent by the terms of the charter-party. Cargo was to be furnished as fast as the vessel could take it, and in case of default in that behalf, either on the part of the charterer or of his agent, the former was to pay demurrage, at the rate of twenty dollars per day for every day the vessel was so detained. Reference was made in the charter-party to Heman S. Hinds, and to no other person, and the whole evidence shows that he procured the spars for the respondent, furnished them to the libellant at the place of loading, and was in point of fact interested in the profits to be made by the adventure. When about two thirds of the spars were loaded, it was dis-

covered that the vessel drew seven feet of water, and the agent of the charterer for shipping the spars and the master of the vessel both agreed in opinion, that the vessel could not safely undertake to carry any more over the bar at the mouth of the river, or through the inlet mentioned in the pleadings. Five witnesses examined by the libellant, including the mate of the vessel, and four of the crew, testify to this fact; and although there is some testimony introduced by the respondent, tending to contradict their statements, that the agent of the charterer concurred in this opinion, yet it is not of a character to affect their credit. That opinion was given, upon the assumption that a vessel drawing more than seven feet of water could not pass over the bar, or at least that the navigation would be dangerous. He was well acquainted with the navigation, and being interested at least to a certain extent that the whole of the spars should be taken, it is not reasonable to suppose that he would under estimate the depth of water, or magnify the danger of overloading the vessel. As appears from the evidence, the island mentioned in the charter-party is some twenty-five miles up the river from its mouth; and to reach the river from the open sea it is necessary to pass Hatteras Inlet, and thence through the Sound, a distance of some seventy-five or eighty miles. By the terms of the charter-party, the charterer stipulated and guaranteed that there was eight feet of water at the place of loading. It appears from the evidence that the respondent examined the vessel, and had the opportunity of ascertaining what depth of water would be required to enable her to accomplish the voyage. He had previously been at the place of loading, and seen the spars on the landing, and was well acquainted with the character of the river. On the other hand, the libellant had never sailed up the river, or been at the place of loading, and had no means of knowing the depth of the water in the river, or at the inlet, or on the bars. At the place where the spars were shipped the water is eight feet deep or more; but the weight of the evidence clearly shows that it is not more than seven, or at most more than seven and a half, feet deep on the bar at the mouth of the river or on the bar at the inlet. Testimony was introduced by the respondent, tending to show that the depth of water is greater, but the circumstances disclosed in the case lead to the conclusion that his witnesses are mistaken. Some seventy-five spars or more remained, when it was ascertained that the vessel could take no more. Both the master and the agent of the charterer who furnished the spars were anxious that the whole should be transported; but they agreed that the vessel was fully loaded for the passage down the river, and to the open sea. Those remaining on the bank were rolled into the river and rafted, and in that manner taken in tow by the vessel. That course was adopted with the expectation that the vessel, after passing the lower bar at the inlet, would come to anchor, and that the master and crew would then be able to take them on board. Accordingly, they were formed into a raft constructed in three parts, arranged one after the other, and fastened together with a large hawser, with cross-lashings to each part made of manilla rigging, to prevent the spars from separating. Much conflict exists in the testimony as to who first suggested the expediency of making the raft. All things considered, the better opinion from the evidence is that it was suggested by the person representing the charterer. At all events, he consented that it should be made, superintended its construction, and pronounced it sufficient after it was done. His statement that he objected to that mode of transporting the remainder of the spars, or that he suggested that the master should wait till the depth of water on the bar was increased by a change in the wind, needs further confirmation. Both he and the master agreed that the vessel could take no more at the landing, or until she reached the open sea; and they both went to work and constructed the raft, using the best materials they had for the purpose. After the raft was constructed it was fastened to the vessel by a hawser, and the vessel sailed for the inlet with the raft in tow. She was so deeply laden, or the water was so shoal, that she once grounded going down the river, dragged badly nearly all the way, and struck three times on the bar at the mouth of the river. All of the witnesses for the libellant agree substantially that they did not find the depth of water in the river but seven feet and five inches, and only seven feet on the bar. Just before the vessel reached the bar the wind increased, and after passing over it she encountered a sharp chopping sea, which chafed and broke the lashings of the raft, causing the spars to go adrift, and most of them were lost. Some eight or ten were picked up by the crew, which, together with all those on board, were safely transported and duly delivered according to contract. It is insisted by the respondent that the libellant is not entitled to recover, because, as he contends, the contract was to pay a round sum for an entire service, and consequently that the performance of the service was by the terms of the contract a condition precedent to the earning of freight. As a general rule, undoubtedly, the delivery of the goods at the place of destination, according to the terms of the charter-party, is necessary to entitle the owner of the vessel to the stipulated compensation. 3 Kent, Comm. (9th Ed.) 298; Cook v. Jennings, 7 Term R. 381; Bright v. Cowper, 1 Brownlow & G. 21; Towle v. Kettell, 5 Cush. 18; Coffin v. Storer, 5 Mass. 252; Barker v. Cheviot, 2 Johns. 352; Blanchard v. Buckman, 3 Me. 1. Right delivery is as essential to the performance of such a contract, and consequently to the right of the carrier to recover compensa-

tion, as safe custody and due transport. To this also may be added, that entire contracts of this nature cannot in general be apportioned, so that if a party undertake for a round sum to transport a specified quantity of merchandise from one place to another before his claim to remuneration is to accrue, he cannot recover for a partial performance, although the completion of the undertaking was prevented by accident. Chit. Cont. 736. In its nature the contract for conveyance of merchandise is an entire contract; and unless it be completely performed by the delivery of the goods at the place of destination, the carrier will in general derive no benefit from the time and labor expended on the partial conveyance. Courts of justice, however, have recognized certain equitable exceptions to this general rule, and those exceptions are as well known and fully established by decided cases as the rule itself. Of these one only need be noticed at the present time. If the owner of the cargo is the cause of its not being transported to the port of destination, full freight may be recovered. Bork v. Norton [Case No. 1,659]; Clarke v. Crabtree [Id. 2,847]; Giles v. The Cynthia [Id. 5,424]; Kleine v. Catara [Id. 7,869]; The Nathaniel Hooper [Id. 10,032]; Clendaniel v. Tuckerman, 17 Barb. 184. On the part of the libellant, it is insisted that he was prevented from transporting the remainder of the spars solely by the fact that the depth of water in the river, and on the route to the open sea, was not sufficient to justify him in taking the remainder on board. He admits that the water was eight feet deep or more at the place where the spars were shipped; but insists that, by the true construction of the charter-party, the guaranty of eight feet of water applies as well to the bar at the mouth of the river, and all the way to the open sea, as to the place where the spars were furnished by the agent of the charterer. That proposition is denied by the respondent, who contends that the guaranty only applies to the place where the vessel lay when she received her cargo. Like other commercial instruments, charter-parties ought to receive a liberal construction, agreeable to the intentions of the parties, and conformably to the usage of trade, and of the particular trade to which the contract relates. Whenever the language of a contract is ambiguous, the intention of the parties is the primary rule of construction; and, in order to ascertain the true sense in which the language was employed, it is not only allowable, but often necessary, to examine the attending circumstances, and to weigh the language in connection with the subject-matter to which it was applied. Tested by this rule, there can be no doubt as to what was the real purpose and object of the guaranty. Confining the investigation within the strictest limits, it still appears that the respondent wanted a quantity of spars transported from the banks of a certain river in the state of North Carolina to certain ports

in the state of Massachusetts. He made proposals to charter the vessel of the libellant to transport the spars. At the time the proposals were made, the charterer knew, or had the means of knowing, what depth of water would be required to enable the vessel to perform the required service; but the libellant had never been at the place of loading, and had no means of obtaining knowledge upon the subject. Inquiry would have been useless, as there were no charts, and seafaring men know little of the river, and were unacquainted with the navigation. Want of knowledge and the means of information would naturally suggest doubts in the mind of the libellant whether the service could safely be performed by the vessel. To remove those doubts, and to protect himself against loss in case they should prove to be well founded, he required the guaranty. He must have known that a sufficient depth of water at the landing would be of little use, if the vessel could not get out of the river after the cargo was laden on board. To suppose that the guaranty went no further than to require eight feet of water at the landing, would be to impute a want of ordinary intelligence or prudence to the libellant, and a course of conduct on the part of the respondent little better than an actual fraud. Such a construction would be both unjust and unreasonable, and therefore cannot be sustained. In view of the attending circumstances, there can be no doubt that the guaranty required that there should be eight feet of water, or at least a sufficient depth to enable the vessel to perform the voyage from the place where the spars were to be shipped to the open sea. That guaranty was a condition precedent to the right of the respondent to claim performance on the part of the libellant. When the libellant had taken on board as many spars as the depth of water in the river and on the bar would enable the vessel to carry, he might well, under the circumstances of this case, have returned to the port of destination and claimed full freight. His contract would then have been performed as far as it was in his power to perform it, and to the extent that there was a failure of performance, that failure would have been caused by the respondent. But he did not do so, and the only remaining question of any importance is, whether his subsequent acts have the effect to vary or defeat his right to recover. All that he did in rafting or assisting to raft the remainder of the spars was done by the consent and with the concurrence of the agent of the shipper. They were voluntary acts, performed without compensation or the promise of compensation. Nothing can be plainer than the proposition that the charter-party made no such requirement and contemplated no such mode of transportation. Whether the rigging used for lashings was suitable or not, it was the best the master had; and the raft, when it was completed, was pronounced sufficient by the

agent of the shipper who superintended its construction. Every effort in his power was made by the master to tow the spars in safety to the inlet; and when the lashings broke and they went adrift, both he and the crew did all that could be done to save them. For the want of a sufficient depth of water the vessel was delayed in her passage down the river, and before she reached the bar the wind increased. After passing the bar, the lashings of the raft were broken by the force of the waves. Some few of the spars were saved, but the larger portion were lost. Under these circumstances, I am of opinion that the spars were lost by a peril of the sea, and that the acts of the master in relation to the raft do not defeat or impair his right to recover on the original contract. Certain other defences are set up by the respondent which will be briefly noticed. In the second place he insists that the master should have employed lighters to carry down the remaining spars to his vessel after she had passed the bar at the mouth of the inlet. That proposition is based upon certain evidence in the case tending to show that such was the usage on that river. Two answers may be given to the proposition, either of which is conclusive against it. Allowing due weight to the evidence, it is not sufficient to prove any such general usage. But suppose the fact to be proved, as assumed by the respondent, still it cannot have the effect to vary the written contract. By the express terms of the charter-party, the delivery of the spars for the purpose of loading was to be made within reach of the vessel's tackles, so that, if any lightering was required, it was to be done by the agent of the respondent, and not by the libellant. When the language of the contract is ambiguous, parol evidence of the usage is generally admissible to enable the court to arrive at the real intention of the parties; but it is not admissible to vary, contradict, or defeat express stipulations or provisions restricting or enlarging the customary right. Add. Cont. (Ed. 1857) 851; Abb. Shipp. 350; 3 Kent, Comm. (9th Ed.) 345; Palmer v. Blackburn, 1 Bing. 61; The Reeside [Case No. 11,657]; Trueman v. Loder, 11 Adol. & E. 589; Donnell v. Columbian Ins. Co. [Case No. 3,987].

It is also insisted by the respondent that the master should have shipped the whole of the spars, and waited with his vessel at some point above the bar, at the mouth of the river, until, by a change of the wind, the depth of the water on the bar had been sufficiently increased to have enabled the vessel to pass over it and proceed on her voyage. That proposition assumes, contrary to the weight of the evidence, that the depth of the water down to the bar, at the mouth of the river, was already sufficient; and in addition to that it also assumes, what is not satisfactorily proved, that a change of the wind would have had the effect to increase the depth of the water to such an extent, not only

on the bar at the mouth of the river, but also on the bar at the inlet at the same time, that the vessel could have proceeded to the open sea. No such requirement as the one assumed in the proposition is found in the terms of the charter-party, and the weight of the evidence clearly shows that nothing of the kind was ever suggested by the agent of the shipper. On the contrary, he first suggested that the vessel could take no more of the spars at the landing, and if he did not first propose the making of the raft, he very readily consented to the suggestion, and superintended its construction. His relative wrote the bills of lading, and he admits that he sent one of them to the respondent to enable him to effect an insurance.

Some of the spars were shipped directly from the bank, and were put on board through the ports of the vessel. One of the ports was cut deeper and enlarged for that purpose as much as possible without damaging the vessel, but, notwithstanding this enlargement, it was still too small to receive the butts of some of the largest spars. To remedy that difficulty the butts were hewn or scarfed, so that they could be put on board in that way. All of that work, however, was done by the agent of the shipper, and not by the libellant, as appears by his own testimony. In view of the whole case, I am of the opinion that the decision of the district court was correct, and the decree in the case must therefore be affirmed with costs.