## THE QUERINI STAMPHALIA, etc.

## THE CREDIT LYONNAIS.

*(District Court, S. D. New York. December 31, 1883.)*

1. SHIPPING—BILL OF LADING—BONA FIDE INDORSEE—FREIGHT PAYABLE—LUMP SUM—QUANTITY UNKNOWN.

   Where a bill of lading, after reciting receipt of a given quantity, weight, etc., contains a further express provision, "quantity, weight, and contents unknown," the vessel may show that less than the amount stated was received, and will not be liable, as for short delivery, even to a *bona fide* indorsee of a bill of lading, if she delivers all that she received.

2. SAME—RECEIPT FOR MORE THAN ACTUALLY PUT ON BOARD.

   If the master acknowledges receipt, knowingly, for a greater amount than has been put on board, *quære,* whether the vessel is liable, in an action *in rem,* for more than the amount actually laden on board.

**3. SAME—CHARTER-PARTY.**

The *bona fide* indorsee of a bill of lading is not affected by the provisions of a charter-party, of which he has no knowledge or notice, so as to be put on inquiry. In such a case he is liable for freight only, according to the provisions of the bill of lading.

**4. SAME—CASE STATED.**

Where the bill of lading provided, "freight to be paid for 410 tons, £451," etc., and "to pay in New York £300.13.4," *held*, this was notice of a specific sum to be paid, though the cargo was short of 410 tons, it appearing that the kilos actually receipted for amounted to only 400 tons.

In Admiralty.

*Condert Bros.*, for libelant.

*Butler, Stillman & Hubbard*, for claimant.

BROWN, J. The libelant is the *bona fide* indorsee of a bill of lading given by the master of the Querini Stamphalia for certain iron shipped at Odessa on August 5, 1880, to be transported to New York. This suit was brought to recover for an alleged short delivery of iron to the amount of a little over 38 tons. The cross-libel was filed to recover £300 for unpaid freight. The evidence shows satisfactorily that all the iron was delivered which was received on board the vessel. No question is made but that this would be a good defense as against the shipper. The libelant, the Credit Lyonnais, however, contends that as *bona fide* indorsee of the bill of lading for value, it has a right to rely upon the representation as to the amount of iron shipped contained in the bill of lading, and a right to hold the vessel and her owners for the delivery of this amount. The bill of lading, however, expressly states that the "quantity, weight, and contents are unknown." In the body it recites the receipt of 406,000 kilos; and this is equal to only 400 tons. Only about 362 tons were delivered. In the margin of the bill of lading, however, is an entry "freight to be paid for 410 tons," etc. Numerous authorities establish the rule that a clause in the bill of lading reciting that the weight or quantity is unknown qualifies the effect of other statements as to the amount or weight, and authorizes proof to show that a less amount was in fact received on board. *Clark* v. *Barnewell*, 12 How. 272; *630 Quarter Casks of Sherry*, 7 Ben. 506; 14 Blatchf. 517; *Shepherd* v. *Naylor*, 71 Mass. 591; *Kelley* v. *Bowker*, 11 Gray, 428; *The Nora*, 14 FED. REP. 429.

In the cases on this subject I find no distinction made in favor of an indorsee of a bill of lading. Most of the cases above cited are those of such an indorsee. Nor do I perceive any reason why any such distinction in his favor should be made; for upon the face of the bill of lading itself he has notice of the qualification which authorizes the master to show that a less amount was actually received. He cannot be, therefore, in the legal sense, a *bona fide* holder relying upon a representation by the master of a specific amount received on board. There is no room, therefore, for any such estoppel as exists in favor of a *bona fide* indorsee where no such qualification appears on the

face of the bill of lading. *Bradstreet* v. *Heran*, 2 Blatchf. 116; *Meyer* v. *Peck*, 28 N. Y. 598; *112 Sticks of Timber*, 8 Ben. 214.

The case of *Jessel* v. *Bath*, L. R. 2 Exch. 267, is almost identical with the present. There the plaintiff was the assignee for full value and *bona fide* holder of the bill of lading of goods shipped on the defendant's vessel, and brought his action to recover for a short delivery of manganese. The bill of lading was similar to the present, stating "weight, contents, and value unknown." The court unanimously held that the action could not be maintained, either at common law or on the statute of 18 & 19 Vict., it appearing that the defendants delivered all that they had received, though less than the number of kilogrammes stated in the bill of lading. Kelly, C. B., says the bill of lading "may be reasonably and fairly read as meaning that a quantity of manganese had been received on board, appearing to amount to thirty-three tons, but that the person signing the bill would not be liable for any deficiency, inasmuch as he had not in fact ascertained, and therefore did not know, the true weight."

Martin, B., says:

"The person, therefore, signing the bill of lading by signing for the amount, with this qualification, 'weight, contents, and value unknown,' merely means to say that the weight is represented to him to be so much, but that he has himself no knowledge of the matter. The insertion of the weight in the margin, and the calculation of freight upon it, does not carry the matter any further; he calculates the freight, as it is his duty to do, upon the weight as stated to him. The qualification is perfectly reasonable, and I do not understand how a statement so qualified binds any one."

Bramwell, B., says:

"This document, though apparently contradictory, means this: A certain quantity of manganese has been brought on board, which is said by the shipper, for the purpose of freight, to amount to so much, but I do not pretend or undertake to know whether or not that statement of weight is correct. On a bill of lading so made out I think no one could be liable in such an action as the present."

These cases seem decisive on this branch of the present controversy.

Again, the indorsee of the bill of lading brings this action *in rem* against the vessel for short delivery. The case of *Pollard* v. *Vinton*, 105 U. S. 7, the case of *Hubbersty* v. *Ward*, 8 Exch. 330, and other authorities cited in *Pollard* v. *Vinton*, seem to me to hold that the vessel cannot be bound, whatever may be the liability of the master, for goods not put on board. In Maude & P. Law Merch. Shipp. 343, it is said, generally, that "the master has, as against his owners, no authority to sign bills of lading for goods not received on board; nor has he power to, nor does he, charge his owners by signing bills of lading for a greater quantity of goods than those on board; and all persons taking bills of lading by indorsement, or otherwise, must be taken to have notice of this." The vessel cannot, in this case, be

held liable for any short delivery, and the libel of the Credit Lyonnais must be dismissed, with costs.

In the libel for freight, there is a question how much freight can be claimed. The vessel was chartered by her owner to H. J. Morrens, who agreed to load from 410 to 420 tons of old, heavy, wrought, scrap-iron, at the rate of 22 shillings per 20 cwt., one-third payable on signing bills of lading, and the rest on delivery of the cargo, "the owner and master to have an absolute lien on the cargo for all freight, dead freight, and demurrage." The iron shipped at Odessa belonged to the charterer. It was weighed in the city and thence brought several miles to the dock. After it had arrived there, a considerable amount was thrown out, before shipment, as unfit, by the charterer's agent, and other portions were stolen, so that considerably less than the lowest amount, namely, 410 tons, stipulated for in the charter, was furnished to the vessel. Under the stipulation for dead freight, the vessel had a lien on the 368 tons shipped for the full freight, at the rate of 22 shillings per 20 cwt., upon the 410 tons agreed to be furnished. The bill of lading was made out for 406,000 kilos, equal to 400 tons, or 10 tons only less than the stipulated amount; but the master was confident that there was even less than this, and he hesitated about signing the bill of lading for that amount, but was assured by the shipper's agent that any difference would be deducted. In the body of the bill of lading, freight was specified "to be paid on the said goods, 22 shillings per 1,015 kilos, as per margin," and in the margin were the following entries, "freight to be paid for four hundred ten tons, £451. Received ⅓—£150.6.8. To pay in New York, £300.13.4. Signed for shipper. G. WERTH."

There is no reference in the bill of lading to the charter-party; the indorsee of the bill of lading is not, therefore, affected by its provisions, except in so far as he had notice of it, and so put on inquiry, equivalent to notice. He has a right to rely upon the bill of lading, and cannot be held liable for dead freight, which is the subject of the present controversy, beyond what is required by the bill of lading itself. Conceding this to the fullest extent, it is impossible for me to read this bill of lading all together, without holding that the Credit Lyonnais were not only put upon inquiry by the peculiar character of the several clauses which this bill of lading contained in regard to payment of freight, and the amount, but also that they had express notice that the sum of £451, less the one-third already paid, was to be paid upon delivery of the cargo, as for 410 tons. The statement in the body of the bill of lading that freight was to be paid, 22 shillings for 1,015 kilos, is qualified by reference to the margin, which shows that 410 tons was to be paid for, while the amount stated to be received on board, namely, 406,000 kilos, amounted to only 400 tons. Here was a very plain ambiguity, even in this part of the bill of lading, which was of itself sufficient to put the indorsee on inquiry; and inquiry could not have failed to disclose the existence of the

charter-party, and the right of the vessel to receive freight on 410 tons. But again, the indorsements in the margin of the bill of lading, made and signed by the agent of the shipper, expressly direct "freight to be paid for 410 tons," namely, £451, which 410 tons amount to, at the rate of 22 shillings per ton. Deducting £150, the margin then reads "to pay in New York, £300.13.4." Here, then, is a specific adjustment of the amount of freight to be paid in New York, arrived at by computation, with the shipper's direction that that amount is to be paid and collected in New York, although it disagrees with the prescribed rate and weight, as given in the body of the bill of lading. The object of this indorsement by the shipper's agent was, as seems to me, plainly to give express notice, both to the captain that he must collect the full amount on delivery, not holding the charterer upon his charter for any deficiency in freight, and also to notify the indorsee of the amount which he must pay. That this amount was irrespective of the actual weight of iron receipted for, and, therefore, necessarily irrespective of the amount of weight delivered, appears upon the very face of the bill of lading.

By force of the terms of the bill of lading itself, therefore, I must hold that the Credit Lyonnais is liable for the full balance of the stipulated freight, and a decree should be entered therefor, with costs.