THE TANGIER.[1]

SOCIETA ANONIMA AGRUMARIA DI NAVIGAZIONE *v.* ANGIER and others.

*(District Court, S. D. New York.   June 24, 1887.)*

1. FREIGHT—DAMAGE TO CARGO—DISPUTE AS TO ALLOWANCE FOR DAMAGE.
    Where a vessel delivers a consignment of fruit, a portion of which is damaged, it is incumbent upon her to ascertain the amount of damage before retaining a part of the consignment for balance of freight, in order that she may not, by retaining an unreasonable amount, become liable for the storage and selling charges.

2. SAME.
    When a ship is, by her charter-party, entitled to her whole freight, "upon a true delivery" of the cargo, and she delivers a portion in a damaged condition, she is entitled only to the specified freight less the damages for the loss on the cargo.

3. SAME—TENDER BY CONSIGNEE—WAIVER OF.
    When the cargo is partly damaged, the refusal of the ship's agents to deliver cargo, except on the payment of a precise sum by consignee, which is in excess of the amount due, dispenses with the necessity of a tender by the consignee.

4. SAME—STATEMENT OF CASE.
    The steam-ship T. brought a consignment of fruit to the libelant, of which 54 boxes were missing, and others were damaged by theft of portions of the contents. Libelant refused, therefore, to pay the freight thereon without an allowance by the ship for the damage, and the ship, insisting upon payment of the "lump sum" for which the vessel had been chartered, retained 735 boxes of fruit pending payment of the balance of freight. This suit was brought against the agents of the ship for damages for refusal to deliver the balance of the consignment, and, after the filing of the libel herein, the 735 boxes were sold, under a stipulation between the parties that they should be so sold for account of whom it might concern, without prejudice to the claim in suit. The charter-party provided that the lump freight was to become due "on a true delivery of the cargo." Each party made an offer of settlement, which was not accepted. Neither party made efforts for an actual adjustment of the loss. The evidence before the court was not sufficient to determine the exact loss to the consignment. *Held* that, if the amount demanded by the ship in its offer of settlement was in excess of the amount actually payable by libelant for balance of freight, the ship should account to the libelant for the value of the packages retained by her, less the amount first due the ship. If the ship's demand was not in excess of what was justly due her, the expenses of the subsequent detention and sale were a charge against the libelant, and it would be entitled only to what might remain of the proceeds of the sale after payment of the freight due, and the expenses of storage and sale. A reference was ordered to ascertain the exact amount due.

The libel in the above case was filed to recover damages for refusal to deliver certain boxes of fruit forming part of the cargo of the steam-ship Tangier from Palermo to New York.   The libelants on the thirteenth of March, 1884, chartered the steamer from the owners to take a cargo of

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

fruit at the lump sum of £1,550, or about $7,500, the balance, after certain specified payments, to be paid "on the true delivery of the cargo" at New York. A cargo was afterwards shipped on board, for which on April 2, 1884, a bill of lading was signed by the master, reciting the delivery of 23,731 packages. Upon arrival at New York, April 26, 1884, the cargo was discharged upon the wharf. All the cargo was delivered to the libelant's agents or consignees, except 54 boxes, which, upon count, were found missing, and 735 other boxes, which on the morning of May 3d were lying upon the wharf, and which Messrs. Bowing and Archibald, the ship's agents, held in their custody until the balance of the charter money should be paid. The libelants, in the course of the delivery of the cargo, had already paid the steamer's agent upwards of $7,000 on account of freight. Against the balance of the freight they claimed that, in addition to certain allowances provided for in the charter, a credit and set-off should be allowed on account of the 54 missing boxes, as well as for the loss on 60 additional "robbed boxes," from which some fruit had been taken. Irrespective of this set-off, the difference between the amount of freight paid and that due upon the whole cargo, under the charter, would be from $300 to $400. At an interview between the agents of the ship and the libelants' agent and counsel on the morning of May 3d, the latter demanded the delivery of the remaining goods, and offered to give a bond, with security, for what might be due upon account of freight, or to deposit with third persons $600 for the same purpose. The agents of the ship refused to accept either of these offers, but offered to deliver the 735 boxes on a deposit with themselves of the whole balance of freight without any offset, and refused to deliver the remaining goods otherwise, except upon the payment of 40 cents per box for the remaining boxes as delivered, which they offered to deliver on such payment. No agreement being reached, the 735 boxes were stored by the ship, and, after the filing of this libel, were sold under a stipulation between the parties that the goods should be sold for account of whom it might concern, without prejudice to the claim in suit.

*Ullo, Reubsamen & Hubbe*, for libelants.

*Butler, Stillman & Hubbard*, for respondents.

BROWN, J. The pleadings and the evidence sufficiently establish a shortage of 54 boxes of fruit. Upon a count of the boxes remaining on the wharf on May 3d, in addition to those already delivered, there were 54 less than the number called for by the bill of lading. The bill of lading, indeed, contained the stipulation that "no claim should be made for any loss arising from difference in marks, numbers, or contents," and excepted the acts of "robbers, thieves," etc. Under the latter clause, the burden of proof would fall, in the first instance, on the libelant to show some *prima facie* evidence of neglect or fault in the ship, whereby the loss in the "robbed" boxes occurred. No such evidence, however, was offered, and the loss on these boxes proved to be too small to be worth further mention. If the exception of loss through "difference in numbers" could be construed as equivalent to a declara-

tion that the ship was not to be held responsible for the precise number of packages specified in the bill of lading as taken on board, upon which I express no opinion, the burden of proof would rest upon the libelant to show the actual number shipped. *Matthiessen* v. *Gusi*, 29 Fed. Rep. 794. But the libel in the third article specifically alleges the shipment of 23,731 packages, and the answer admits that the steamer "did load cargo at Palermo as specified in the third article," without any denial anywhere of the number alleged. This admission dispenses with any further proof by the libelant of the number shipped, and casts upon the ship the presumption of negligence in the loss of the missing 54 packages, and the duty of showing that the loss arose either without her fault, or from some other specific cause excepted in the bill of lading. This has not been done, and the ship must be deemed answerable, therefore, for the 54 cases.

As the ship's right to her whole freight was conditioned "upon the true delivery" of the whole cargo, the demand by her agents that the entire freight should be paid was not legally justifiable. She was only entitled to her specified freight, less the damages for the loss of the missing packages, for which she was presumptively liable. Her lien, and the right to hold the remaining 735 packages, were limited to the balance remaining after deducting the offset. The libelants, on the other hand, had no right to the delivery of the 735 packages, except on the payment of this balance. They could not legally require the ship's agents to accept, in lieu of cash, for this balance, either a bond with security, or a deposit with third persons. Prudence would doubtless recommend that each should agree upon some amicable arrangement for the due security of both. *Brittan* v. *Barnaby*, 21 How. 527, 534. But the law cannot compel a new agreement, nor fix its terms. If the parties came to no satisfactory arrangement, each was equally bound, at its peril, if it would avoid further responsibility, and the liability of further loss, to ascertain at once the true amount of the offset, so as not to exceed its legal rights in any demands upon the other. *The Eddy*, 5 Wall. 481; *Twelve Hundred and Sixty-Five Vitrified Pipes*, 14 Blatchf. 274.

The libelant, upon tendering a sum sufficient to cover what was really due, if delivery was refused, could immediately libel the vessel, and hold her for the value of the goods retained. If the libelant refused to pay the proper sum demanded for the balance of freight, not only could the goods be rightly retained in custody, but they could be stored, and subsequently sold by the respondents at the libelants' risk and charge. It was the duty, as I have said, of the ship to aid in ascertaining the deduction to be made from the specified freight, because the deduction itself was an allowance to be made on account of the ship's own fault in not making a "true delivery" of the whole cargo; and because the mode of adjustment by offset, for the loss of a part of the goods, is an equitable release of the ship from the strict conditions of the charter and bill of lading, by which the payment of the entire freight as a lump sum was conditioned upon a delivery of the entire cargo, which the ship had by her negligence become unable to perform.

Neither of the parties in this case apparently took any immediate steps to ascertain what the exact offset would be; and, so far as I can see, no excuse is shown by either for not doing so; nor was there any effort made at the time by either for an actual adjustment of the loss. The evidence shows that there is always a somewhat similar loss in fruit cargoes, usually a smaller amount only; and that from $50 to $100 of the freight is customarily left unpaid upon a delivery of the whole cargo until the precise loss is ascertained. The libelants' agent testified that missing boxes are accounted for at the average price per box of the whole cargo, which in this case was not much above one dollar a box.

The offer of the ship's agents to deliver the 735 boxes upon payment of 40 cents per box would have required the payment of $294, which would seem to be, in any event, not much above what would be payable to them upon a fair accounting for the missing boxes, as well as for the loss upon the "robbed" boxes. The difference was so small as to furnish no reasonable ground for the litigation and expense which both sides have incurred in standing upon their supposed legal rights.

Upon the defendants' plea of the stipulation made between the parties, and the sale thereunder, I think the settlement of the whole matter is drawn into this cause. The evidence before me is not sufficient to enable me to determine satisfactorily the precise amount which would be due to the ship under all the terms of the charter and the drawback provided for, or the precise offset to which the libelants are entitled for the "robbed" and the missing boxes. If the demand by the ship's agents of 40 cents per box upon the 735 boxes was in excess of the amount actually payable by the libelants for balance of freight, deducting all proper offsets, the respondents must account to the libelants for the value of the packages retained by them, less the amount due to the ship. The final refusal of the ship's agents to deliver, except on the payment of a precise sum per box, if that sum proves to be excessive, dispenses with the need of any tender by the libelant of the precise amount due; and the subsequent sale of the goods would then be at the respondent's risk, both as respects the prices realized and all the expenses of sale. If the demand of 40 cents was not in excess of what was justly due to the respondents, the proper expenses of the subsequent detention and sale of the goods was a charge against the libelants, and under the stipulation they will be held to the prices brought; and they will be entitled only to what, if anything, may remain of the proceeds of the sale after payment of the freight due, and all the expenses of storage and sale. A reference may be taken to ascertain these amounts.