## GIBSON v. BROWN.[1]

*(District Court, S. D. New York.  November 20, 1890.)*

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—AMOUNT OF CARGO DELIVERED—LUMP
  SUM.
    To take the case out of the rule that freight is payable only on the packages delivered, the language of the carrier's contract must express such intent with reasonable certainty.

2. SAME—BILL OF LADING—STIPULATION AS TO FREIGHT.
    A bill of lading provided for freight at the rate of 32/6 per ton, "to be paid on right delivery as customary as per memo. in the margin," the memorandum in the margin being: "Imperial gallons 6,052, at 210 galls. per ton, equals 28.819; @ 32/6 per ton, £46.16.7." *Held,* that the stipulation was not such certain contract for payment of a lump sum as to entitle the carrier to recover the full amount of the freight, on a short delivery, occasioned by twice discharging at ports of distress through perils of the sea.

3. SAME—CARGO-OWNER—ALLOWANCE IN GENERAL AVERAGE—INCLUSIVE OF FREIGHT.
    An allowance in general average was made to a cargo-owner for 18,000 lbs. of oil lost by sea perils, the value being calculated on the basis of the New York price, which would include the freight to New York. *Held,* that the ship was entitled to recover the freight on the 18,000 lbs.

In Admiralty.  Suit for balance of freight.
*Wing, Shoudy & Putnam, (C. C. Burlingham,* of counsel,) for libelant.
*Bangs, Stetson, Tracy & MacVeagh,* for respondent.

BROWN, J.  The libel is filed to recover a balance of $428.79, freight alleged to be due upon several consignments of cocoanut oil from Cochin China, and upon the bills of lading therefor indorsed to the respondent. A considerable number of the casks were lost by sea perils.  The respondent has paid the stipulated rate of freight upon the number of gallons actually received by him.  The libelant contends that the freight specified in the bills of lading constitutes a lump sum which the respondent was bound to pay in full, notwithstanding the fact that a portion of the packages was lost in transportation.  There were four bills of lading, all of which provided for the payment of freight as follows: "Freight for the said goods at the rate of 32/6 per ton of 210 imperial gallons to be paid on right delivery, as customary as per memo. in the margin, at port of discharge."  In the margin was the following: "Memo. of freight. * * *  Imperial gallons 6,052, at 210 galls. per ton, equals 28.819; @ 32/6 per ton, £46.16.7."  At the bottom was a stipulation: "Not accountable for leakage or breakage, except from improper stowage."  On the trial, the evidence of one witness was given, to the effect that it was customary to collect full freight, though a part of the packages were missing, if the aggregate freight was stated in the margin, as in this case. So much must depend upon the circumstances of each case, and upon the language of the bill of lading itself, and the testimony of this witness seemed to me so uncertain in several respects, that I cannot find established the existence of such a custom.  The respondent, who had had equal experience in similar importations, testified that he had never

known or heard of such a custom; and a contrary instance was produced in dealings with the firm with which the libelant's witness was connected. Even if the words "as customary" in the bill of lading be connected, therefore, with the rate of payment per ton instead of with the word "delivery," (a doubtful construction,) I do not think the proofs sufficient to change the construction to be reasonably put upon the language of the bill of lading itself. No doubt, where a lump sum is specified as the freight to be paid on delivery, whether by charter-party or bill of lading, the consignee accepting the goods must pay the stipulated sum without deduction for what may be lost without the fault of the ship. This rule is applied because it is inferred from the language of the bill of lading or charter-party that the parties intended that the ship should receive the particular lump sum stipulated for her services, without incurring any risk of loss on freight through a loss of part of the goods without her fault. *Shipping Co.* v. *Armitage*, L. R. 9 Q. B. 99, 107. In the present case, had all the casks been delivered by the ship, and it had only been a question of loss through leakage, inasmuch as it was also stipulated that the ship was not to be liable for leakage, I think she would have been entitled to recover the whole freight. All the packages having been delivered, the vessel would be entitled to compute the freight upon the whole quantity, since the delivery would have been a "right delivery" by the ship, so far as she was concerned, of all taken on board. *The Defiance*, 6 Ben. 162; Carv. Carr. by Sea, 578, 579. The present case seems to me substantially different. Through perils of the seas, the cargo shifted. A portion of the packages were broken. The ship made ports of distress where the cargo was discharged, and, during such discharge, other damage and breakage arose. Much oil escaped belonging to the libelant and to other shippers. What could be saved was gathered up, and, its identity being lost, it was apportioned among the different owners. Upon arrival in New York, about one-sixth of the whole quantity, and of course a greater proportion of the original packages, was missing. Upon such facts I do not think the fair construction of these bills of lading demands the payment of freight as a lump sum. In all the cases where the payment of a lump sum as freight has been enforced, the intent of the parties to that effect has been clear upon the language of the bill of lading or charter-party. *Shipping Co.* v. *Armitage, supra; Robinson* v. *Knights*, L. R. 8 C. P. 465; *The Norway*, 3 Moore, P. C. (N. S.) 245; *Querini Stamphalia*, 19 Fed. Rep. 123. Here, not only does the bill of lading state that the payment is to be "at the rate of 32/6 per ton on right delivery," but the margin, to which reference is made, repeats the same rate, viz., "32/6 per ton." This is language of quite a different significance from that used in any of the cases where the construction has been that of a stipulated lump sum, and does not seem to me to import any such intent. If the libelant's contention is correct, then either the consignee or the shipper would be bound to pay the sum named, though nearly all the goods were lost or jettisoned through sea perils. Ordinarily, freight is collectible only upon packages delivered. To take the case out of that

rule, the language of the contract must express that intent with such a reasonable certainty as does not appear upon these bills of lading. The evidence shows that in the general average adjustment, which included the expense of discharging the cargo at the ports of distress, and the loss of the respondent's oil occasioned by such discharge, an allowance was made to the respondent as a credit in general average for the oil so lost, on the basis of the New York price, which would include the price of freight to New York. This allowance was made upon 18,000 lbs. of oil, upon which the freight, at the rate specified in the bills of lading, would amount to $————. As the respondent has the benefit of so much charge for freight, he should pay it to the ship, for which the libelant may take a decree, with interest from November 20, 1890.