CHRISTIE et al. v. DAVIS COAL & COKE CO.

(District Court, S. D. New York. June 21, 1899.)

1. SHIPPING—FREIGHT—PORTION OF CARGO UNDELIVERED.
   As a general principle, freight is payable only on so much of a cargo as is delivered, and there is an equitable presumption that such is the contract of the parties, to overcome which a contrary intent must be expressed with reasonable clearness and certainty.

2. SAME—CONSTRUCTION OF CHARTER—FREIGHT PAYABLE ON QUANTITY INTAKEN—JETTISON.
   A charter of a ship to be loaded entirely with coal for a given port, which provides for the payment of freight at so much per ton on the "quantity intaken," is in the nature of a lump-sum charter, and binds the charterer for the payment of freight on the entire cargo intaken where any part of it is delivered, though a portion was jettisoned during the voyage. This construction is not affected by the agreement of the ship for delivery of the cargo, sea perils excepted, nor by a provision that the freight shall be payable on proper evidence of "right delivery of the cargo," since that means no more than delivery in accordance with the charter, by which losses by sea perils are excepted.

3. SAME—GENERAL AVERAGE ADJUSTMENT.
   Where the charterer is, by the terms of the charter, required to pay the freight on goods lawfully jettisoned during the voyage, the consignee is entitled to allowance therefor in the general average adjustment, but is assessed only on the foreign value of the goods, less the freight, which is assessed to the vessel.

In Admiralty.

Convers & Kirlin, for libelants.

Cowen, Wing, Putnam & Burlingham, for respondent.

BROWN, District Judge. The above libel was filed by the owners of the steamship Mercedes to recover freight and demurrage from the charterers of that steamship, upon a voyage from New York to Tampico, Mexico, in September, 1898. The claim for demurrage, which was the principal item, having been adjusted, there remains only to be determined the question of the liability of the respondent for the sum of $952.03, the unpaid freight upon a portion of the cargo lawfully jettisoned by the master in consequence of stranding without the ship's fault within Mexican waters, not far from Tampico, and a little before reaching that port. The respondent contends that the libelants must look to a general average contribution for this portion of the freight; while the libelants claim payment directly from the respondent, on the ground that the charter by its terms requires the freight to be paid "on the quantity intaken," leaving the respondent to seek indemnity through the general average contribution.

The clauses of the charter bearing upon this question provide:

"The ship shall take on a full and complete cargo, * * * and being so loaded shall therewith proceed to Tampico, Mexico, or as near thereunto as she may safely get, and there deliver the same in the customary manner, where she can safely deliver afloat, on being paid freight, at and after the rate of one $65/100$ dollars on coal, and two $70/100$ dollars on coke. all United States currency, per ton of 2,240 lbs. on the quantity intaken in full of all port charges, pilotage, wharfage, etc. (the act of God, perils of the sea, fire, barratry of the master and crew, enemies, pirates. thieves, arrests, and restraints of princes, rulers, and people, collision, stranding and other accidents of navigation, excepted).

"The bills of lading to be signed without prejudice to this charter, but at not less than chartered rate. Sufficient freight to be advanced to the master at discharging port for the vessel's necessary disbursements, subject to the usual charge of 2½ per cent. for interest, insurance and all charges: and the balance in cash at New York on proper evidence of right delivery of the cargo. * * * In case of average the same to be settled according to York-Antwerp rules of 1890."

Freight in the strict sense is the price of the carriage and delivery of goods by the ship according to the agreement of the parties. Kirchner v. Venus, 12 Moore, P. C. 390. In a wider sense, in insurance law, it includes compensation for any use of the ship. Carv. Carr. by Sea, § 542; 1 Arn. Ins. 31. "As a general principle," says Bowen, J., in Spaight v. Farnworth, 5 Q. B. Div. 115, "freight, in the absence of a special agreement to the contrary (or uniform custom of trade), becomes payable only on so much cargo as has been both shipped, and carried and delivered." If part of the cargo is lost on the voyage, the consideration for the payment of freight pro tanto fails; and the usual form of charters and bills of lading, long in use, requires payment on delivery only.

The presumption that freight is payable only upon cargo delivered rests therefore upon equitable grounds; and this equitable presumption ought to prevail, unless the contract of the parties expresses a

contrary intent with reasonable clearness and certainty. There is the more reason for maintaining this construction as respects all sea risks, inasmuch as such risks may be, and usually are, covered by insurance. Freight is liable to be lost by sea perils. That risk must be borne by the carrier and covered by insurance in his behalf. That risk ought not therefore to be shifted by construction merely and cast upon the shipper, except upon reasonably clear evidence that such was the intent, or the necessary effect, of the contract. Otherwise, the shipper is misled, and suffers loss through lack of reasonable notice that he must insure the freight interest at his peril. While, therefore, the contract of the parties on this point is absolutely controlling when its intent and meaning are clear, either from the face of the instrument itself, or when otherwise definitely ascertained, still, in construing any modifications of the usual terms of shipment introduced into the charter or bills of lading for the ship's benefit, if the meaning and extent of such modifications are not clear, they should not be extended beyond the presumed intent, to be gathered from the circumstances and the presumed purpose of the changes. It was upon this view that Gibson v. Brown, 44 Fed. 98, was decided in this court.

The same principle of construction should without hesitation be applied in this case. The only question is whether the provisions of this charter show any such indefiniteness, inconsistency, or ambiguity as regards the payment of freight, or perhaps even whether any such unreasonable results would arise from a literal application of its language, as would authorize the court to limit and restrain its literal reading by construction.

Upon repeated consideration, I am of opinion that there is no such ambiguity, nor any such unreasonable consequences involved in the clause here in question, as to justify any such limitation and that full freight should be paid.

1. The charter, as appears on its face, is a special printed form adapted for use in the transportation of coal to Tampico, Mexico, and is headed in large letters "TAMPICO COAL $_{\text{or}}^{\text{and}}$ COKE." The stipulation that freight shall be paid at so much per ton "on the quantity intaken" is in itself perfectly clear, certain and unambiguous. The cargo being of coal in bulk, this stipulation serves several purposes, all useful to the ship, and all equally natural and reasonable, under the circumstances of this charter.

(a) It saves the labor, expense and delay of weighing at the port of discharge, if no loss arises by sea perils. Where a loss like this occurs, reweighing is necessary in the interest of both parties, both for a proper settlement of insurance, and for a correct adjustment of general average. (b) It secures the ship against any loss of freight through loss of weight by the necessary handling of the coal, or by its disintegration on the voyage. (c) When, as in this case, the shipowner lets the whole capacity of the ship for a single cargo, he may rightfully and naturally stipulate for the virtual payment of a sum certain, to be determined at the time of loading, according to the intake quantity or weight, instead of inserting a lump sum in the charter at the time when it is executed, as is often done, long before the

precise amount to be taken on board can be known. The Norway, Brown. & L. 226; Robinson v. Knights, L. R. 8 C. P. 468; Shipping Co. v. Armitage, L. R. 9 Q. B. 99; Blanchet v. Collieries Co., L. R. 9 Exch. 74. This does not make precisely a lump-sum charter, but only an approach to it; and when only such an approach to a lump-sum charter is contemplated, as is evident here, this method of fixing the freight to be paid for the use of the ship is more favorable to the shipper, both because the precise rate per ton is known to him at the time of the contract, and because, if the cargo is wholly lost, no freight at all will be payable; in this respect possibly differing from a pure lump-sum charter, on which the sum agreed on may perhaps be payable if the voyage is accomplished, though all the cargo be lost by excepted sea perils. Carv. Carr. by Sea, § 550; Willett v. Phillips, 8 Ben. 459, Fed. Cas. No. 17,683; Hart v. Shaw, 1 Cliff. 358, Fed. Cas. No. 6,155; The Tangier, 32 Fed. 230; 1 Pars. Mar. Law, 245. The apparently contrary provisions of the German Code (section 617) are certainly different from our law. And in case of a partial loss under this charter the respondent in paying the freight fixed by the intake quantity pays no more than he would be obliged to pay if the charter were an out and out lump-sum charter.

As above stated, I find nothing in this contract from which I am authorized to hold that the provisions as to freight are not designed to cover all the points above named as much and as truly as any one of them. Pure lump-sum charters are so common that there is no presumption against the intent of the parties to make what is in effect a near approach to one. The present case is in one regard somewhat stronger for the libelants than the case of Harrison v. One Thousand Bags of Sugar, 44 Fed. 686; Id., 4 C. C. A. 34, 53 Fed. 828, where, as Dallas, C. J., dissenting, points out, the insertion of the words "intake weight" might have been intended only to secure the weight on the cargo delivered, as fixed at the port of shipment, instead of the weight at the port of discharge, in view of its liability to be varied on the voyage, and without reference to the usual rule as to delivery of cargo. 53 Fed. 834, 4 C. C. A. 46. But here there seems to be no room for uncertainty. The stipulation is not for payment per ton according to the weight at the port of loading, but for payment at so much per ton "on the quantity intaken," i. e. on the quantity of coal shipped. When the ship was loaded the weight was taken; the "quantity intaken" was thereby determined, and the freight to be paid for the use of the ship was thereby fixed, provided the ship arrived with any cargo on board. I do not perceive how it can be permissible to substitute for that plain stipulation an agreement to pay freight only upon the quantity delivered. Moller v. Living, 4 Taunt. 102; Tully v. Terry, L. R. 8 C. P. 679; The Querini Stamphalia, 19 Fed. 123.

2. The subject-matter being coal in bulk, the clause admits of no other interpretation than payment of the entire freight on the whole quantity intaken. In other cases where the cargo is divisible into distinct portions, it may be otherwise. In Spaight v. Farnworth, 5 Q. B. Div. 115, some deals and battens were shipped with the measures of each chalked upon them separately; the charter party made

the "freight payable on the intake measure of quantity delivered"; and a part being lost, it was held that freight was payable only on what was delivered, but payable upon that portion according to the intake measure as chalked. This was a strict observance of the letter of the contract. But in a cargo of coal in bulk, there can be no such separation or distinction. If the cargo were of casks or other separable portions of different weights, a stipulation merely to pay so much per ton on the intake weight might well receive the narrower construction, as intended only to be applied distributively to the different parts, i. e. according to the intake weight of each part delivered. But freight payable on coal shipped in bulk, and "on the quantity intaken," cannot possibly be applied distributively to different portions of the cargo. It is applicable to the cargo as a whole, or not at all.

3. Although it may be an implied condition of the ship's right to freight under a charter like this, that some portion of the cargo be delivered, yet no clause of this charter requires or implies that all the cargo shipped must be delivered in order to entitle the ship to full freight. That is the case when freight is payable "on delivery of cargo." But here the charter is different. The ship agrees, indeed, "to deliver the same on payment of freight," etc., "sea perils excepted." But if the ship delivers all the cargo except what sea perils excuse her from delivering, she fulfills this clause of her agreement; and by this same clause, therefore, she is not bound to deliver what remains on board, except on payment of freight "on the quantity intaken," i. e. on the whole quantity shipped. The subsequent clause providing that the balance of freight, after certain advances, shall be payable in New York "in cash on proper evidence of right delivery of cargo," is the provision that in reality regulates the shipper's obligations to pay freight; and it harmonizes strictly with the previous provision. The condition specified in this clause, viz. a "right delivery of cargo," requires only a delivery of all that the ship is bound to deliver; excluding, therefore, losses by excepted sea perils. Robinson v. Knights; Shipping Co. v. Armitage; Harrison v. 1,000 Bags of Sugar, ut supra.

4. The exception of sea perils in the clause of the charter above quoted is not a limitation on the shipper's duty to pay freight; nor does it connect grammatically with that clause, but only with the ship's agreement to deliver the cargo. If it was a limitation of the shipper's agreement to pay freight, it would be equally applicable to lump-sum charters, which is not the case, as the authorities above cited show.

5. As the result to the shipper or consignee, if he is here required to pay full freight on the quantity intaken, is no more prejudicial to him than in ordinary lump-sum charters, and in fact is somewhat less prejudicial, no absurd or unreasonable consequences can be invoked as a ground for restricting the ordinary meaning of the language of the clause in question.

What has been said above has mainly had reference to a loss of part of the cargo directly by sea perils. Such a loss would usually be more serious to the shipper or consignee than a loss by a lawful

jettison like this, for which he would recover full indemnity in general average.

If the respondent pays this freight the freight so paid as well as the value of the goods must be made good to the consignee by allowance to him in the average adjustment; while if not paid by the respondent, the freight on the jettisoned goods will be made good to the master in general average. In either case, this freight will enter into the contributory values for the same amount, under the York-Antwerp rules, which are adopted in this charter. Mutual Safety Ins. Co. v. Cargo of the George, Olcott, 157, Fed. Cas. No. 9,982; Gourl. Gen. Av. 486. The assessment on the freight must also in either case be paid by the master, because, at the time of the jettison, this freight, like all the rest of the freight, was at the risk of the ship, and not of the shipper.

6. The usages, rules and provisions of law as respects the adjustment of general average are subject to the particular agreements made by the parties, so far as they are lawful; and they vary with the varying stipulations of the contract. If freight is paid, or secured absolutely in advance, it is no longer at the shipowner's risk, but becomes the shipper's concern alone. And the rule of the English, American and Mexican law (Code Com. § 733), that the consignee of jettisoned goods is not required to pay freight on them, is only the result of the ordinary presumption, in the absence of any different agreement, and of the ordinary provision of the bill of lading, that freight is payable only upon the goods delivered. That rule is superseded by the special clause in this charter party on that subject. And the same is true as to this point of the application of the York-Antwerp rules.

I think, therefore, that the clause here in question requires the charterer to pay the freight on the jettisoned goods. This is, in fact, precisely what is required of the consignee by several of the European Codes under the ordinary bill of lading as respects jettisoned goods, without any such special provision as is found in this charter. The Ordonnance of 1681 provided that "the captain shall be paid" (i. e. by the consignee) "the freight on goods thrown into the sea for the common safety, subject to the charge of contributing" (in general average). Liv. 3, tit. 3, art. 13. The French Code of Commerce re-enacted the same provision. Section 301. These provisions are not among the dispositions as to general average, but among the regulations of the rights and duties of ship and shipper. "The reason why the entire freight of goods jettisoned," says Valin (1 Com. de L'Ord. p. 654), "is due to the master is that the value of the effects lost is thrown as well upon ship and freight as upon the goods saved by the jettison." To the same effect are the Codes of Italy (section 576) and of several other European countries. By these Codes merchandise jettisoned is made good in general average at its full value at the port of discharge (Code de Com. § 415), and without deduction of freight, as with us, for the very reason that the consignee is required to pay the freight in full. 4 Desjardins, Droit Com. Mar. § 1052, pp. 436, 437, and note; 2 Valroger, Droit Mar. § 868; 5 Valroger, Droit Mar. § 2162.

With us the law on that point is undoubtedly different. In the absence of any stipulation to the contrary, the consignee is not required to pay freight upon goods not delivered, and therefore not upon goods jettisoned; and though the owner of goods jettisoned is indemnified in general average according to their value in the port of discharge, he is allowed indemnity only; and hence in proving the foreign value he must deduct any expenses which the jettison has saved him from incurring. The freight is, therefore, deducted from the consignee's claim when he has not become obligated to pay it; but in that case the whole freight on the jettisoned goods is allowed to be proved by the master and is made good to him. When the charterer however or consignee has either paid the freight previously or secured it absolutely; or when, as in this case, he has become absolutely bound for its full payment though only a part of the cargo is delivered in consequence of a lawful jettison, he is not saved that item of expense; and hence he is not disallowed freight in the average adjustment, but may then prove both the value of the goods and the freight paid or secured, which by so much enhances their value and cost. Carv. Carr. by Sea, §§ 437, 440; Gourl. Gen. Av. 541, 488; 4 Desjardins, Droit Com. Mar. § 1052, p. 437.

As regards contributory values on the other hand, the charterer in a case like the present, as under the European Codes above referred to (4 Desjardins, Droit Com. Mar. § 1064), though entitled to prove his claim for contribution for both the goods and the freight, is assessed only upon the foreign value less the freight; for the reason, as before stated, that at the time of the jettison, the entire freight was at the risk of the ship and not of the respondent, as it was not then certain that the ship would arrive, or that any freight would ever become chargeable against the charterer. Contribution is, therefore, to be assessed against the owner of the ship upon the whole freight, less the deductions only allowed by the York-Antwerp rules.

The above observations concerning the general average adjustment do not apply to goods carried on deck.

The answer sets up the obligation of the libelants for their pro rata contribution to make good the loss of the cargo and freight by the jettison, as a set-off, in case the respondent is held liable to pay the freight. The freight due upon the jettisoned goods may, therefore, be paid into the registry of the court to await the determination, by the completion of an average adjustment, of the amount of the contribution due from the respondent. The Oquendo, 38 Law T. (N. S.) 151.

An interlocutory decree may be entered accordingly, and for a general average adjustment to be made by an adjuster to be agreed upon, or as the court may direct.